**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| JEREMY R. GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. _____ |
| | ) | |
| HAMBLEN COUNTY, Tennessee, | ) | Jury of Twelve Demanded |
| a governmental entity, | ) | |
| | ) | |
| ESCO R. JARNAGIN, Hamblen | ) | |
| County Sheriff, | ) | |
| | ) | |
| TERESA LAWS, Captain of the | ) | |
| Hamblen County Sheriff's | ) | |
| Department, | ) | |
| | ) | |
| ERIC RICE, Corrections Officer, | ) | |
| | ) | |
| DUSTIN THARP, Corrections Officer, | ) | |
| | ) | |
| JOHN and JANE DOES 10, | ) | |
| employees of the Hamblen County | ) | |
| Sheriff's Department, | ) | |
| | ) | |
| Defendants. | ) | |

---

### COMPLAINT FOR DAMAGES

---

**COMES** Jeremy R. Garcia ("Plaintiff"), by and through his attorney, and brings this

Complaint against Defendants, Hamblen County ("Hamblen County"), Hamblen County Sheriff

Esco R. Jarnagin ("Sheriff Jarnagin"), Captain Teresa Laws ("Captain Laws"), Corrections Officer

Eric Rice  ("Rice"), Corrections Officer Dustin Tharp, and John and Jane Does 1-10 (collectively,

"Defendants").

# TABLE OF CONTENTS

I.      NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      Government Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      Individual Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     FACTUAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      Events Leading Up to Plaintiff's February 26, 2015 Beating. . . . . . . . . . . . . . . 11

        B.      The "Hit" and Brutal Beating of Plaintiff by Inmate Enix. . . . . . . . . . . . . . . . . . 17

        C.      Plaintiff's Injuries Required Emergency Treatment,
                Transfer to a Trauma Hospital, and Immediate Surgery. . . . . . . . . . . . . . . . . . . . 19

        D.      Circumstances Reveal Plaintiff's Safety Was Compromised. . . . . . . . . . . . . . . . 20

        E.      Post-Incident Investigations and Repercussions. . . . . . . . . . . . . . . . . . . . . . . . . 22

        F.      Plaintiff's Injuries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        G.      Defendants Concealed Details of the Incident. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        H.      "You've Got a Serious Problem" – Safety Problems at the Jail. . . . . . . . . . . . . . 26

        I.      Policies, Customs, or Practices Disregarding Inmate Safety Concerns. . . . . . . . . 35

V.      WAIVER OF IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VI.     CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VII.    DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VII.    JURY DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VIII.   PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# I.  NATURE OF ACTION

> Having incarcerated "persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct," . . . having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. . . .  Prison conditions may be "restrictive and even harsh," . . . but allowing the beating or rape of one prisoner by another serves no "legitimate penological objectiv[e], . . . any more than it squares with" evolving standards of decency[.][1]

1.      This action is brought to recover damages under federal civil rights laws and Tennessee law against Defendants for their acts and/or omissions leading up to the brutal beating of Plaintiff at the Hamblen County Jail ("Jail") at the hands of a violent and angry inmate who had been "paid" to beat Plaintiff while he slept on the Jail floor.  Plaintiff was beaten notwithstanding the fact that each of the Individual Defendants had one or more opportunities to avert the attack after repeated warnings that Plaintiff's safety was in jeopardy.

2.      In September 2014, Plaintiff, an intellectually-disabled 40-year old inmate, had been repeatedly threatened, harassed, and intimidated by several men affiliated with a ring of violent inmates known as "The House."  Corrections Officers witnessed the altercations, and when Plaintiff sought to be transferred to another area of the Jail, his request was granted.  Months later, in February 2015, Plaintiff found himself incarcerated again (on a misdemeanor probation violation) in the custody of the Hamblen County Sheriff's Department ("HCSD") at the overcrowded and understaffed Jail.

---

[1]*Farmer v. Brennan*, 511 U.S. 825, 832, 834 (1994) ("[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'")

3.     Realizing that several of the same men who had previously threatened, harassed, and intimidated him were still incarcerated, and fearing for his safety, Plaintiff pleaded with Corrections Officers to make sure he was not housed with his aggressors. This time, his pleas were ignored. The threats, harassment, and intimidation started again, with one member of The House ring soliciting another inmate to beat Plaintiff. Plaintiff did everything he could to be transferred, repeatedly pleading with Corrections Officers, all of whom were aware of The House and its intimidation of Plaintiff, writing a note to Corrections Officers asking to be moved, and even having his mother telephone the Sheriff and Jail Administrator and asking them to intercede for her son's safety.

4.     Plaintiff's repeated pleas were in vain. On the night of February 26, 2015, while he slept on the Jail floor, he was viciously attacked and brutally beaten by another inmate enforcing a "hit" on Plaintiff. Plaintiff was beaten so viciously that he suffered multiple facial fractures, a closed fracture of the nasal bones, a left orbital wall fracture, a left maxillary sinus fracture, a left zygomatic arch fracture, a facial laceration below his left eyebrow; a contusion of his scalp, a concussion, and a conjunctival hemorrhage. Plaintiff was hospitalized and underwent emergency surgery to repair the multiple fractures caused by the beating, requiring the insertion of plates and screws into Plaintiff's face. The injuries left Plaintiff with, among other things, Post-Traumatic Stress and severe cognitive difficulties requiring ongoing therapy. (*See* Photographs, Exhibit 1).

5.     The Individual Defendants, acting under color of state law, deprived Plaintiff of rights secured by the Constitution or laws of the United States. Defendants had a duty under the Eighth and Fourteenth Amendments to the United States Constitution to take reasonable measures to guarantee Plaintiff's safety while he was in their custody, including a duty to protect him from violence at the hands of other inmates. Defendants violated their duty not only by ignoring

-2-

substantial risks of serious harm to Plaintiff, but also by creating a substantial risk of harm to Plaintiff and other inmates by implementing, acquiescing to, condoning, or otherwise ratifying policies, customs, and/or practices that have effectively turned the Jail into a house of mayhem, where inmates are:

- packed together into a chronically and grossly overcrowded Jail, often forced to sleep on a concrete floor;

- poorly supervised, if at all, by a severely understaffed and untrained Jail staff;

- commonly unmonitored by Jail staff, in-person or via audio or video;

- not separated based upon criminal or other relevant classification; and

- housed in a building not conducive to inmate safety.

6.     Each of the Individual Defendants were in a position to know, and, in fact, did know the risk of an impending attack on Plaintiff, but did nothing to prevent or stop it . . . until after Plaintiff had already suffered serious and permanent physical and mental injuries. Each Individual Defendant disregarded that known risk by failing to respond to it in a reasonable and prudent manner, leading directly to Plaintiff's beating and injuries. As such, and as described below, the Individual Defendants demonstrated deliberate indifference to the health and safety of Plaintiff, proximately causing his injuries.

7.     In a place where Plaintiff should have been safe and protected, he was instead the victim of a brutal assault causing him critical injuries.

8.      Among other rights, Plaintiff had the right to be secure in his person while in the custody of the HCSD. This action, brought under 42 U.S.C. § 1983, arises as a result of:

(a)    Defendants' failure, despite multiple warnings, to protect Plaintiff from another inmate, causing him to suffer serious bodily and psychological harm;

(b)    the unconscionable policies, customs, or practices of the HCSD which lead directly to Plaintiff's injuries;

(c)    Defendants' deliberate indifference toward the physical and psychological well-being of Plaintiff, in deprivation of Plaintiff's Constitutional rights; and

(d)    Defendants' outrageous conduct.

9.    Jail staff, including Defendants Sheriff Jarnagin, Captain Laws, Corrections Officer Rice, and Corrections Officer Tharp, were warned that Plaintiff's safety would be compromised if he was placed in the same cell as inmates affiliated with the jail-ring known as "The House." These Defendants were informed, verbally or in writing, by Plaintiff or his mother, and asked to intercede and transfer Plaintiff to a more secure area in the Jail before he was assaulted. Each of the Individual Defendants had a clear opportunity to thwart the brutal assault well before it happened. And each of the Individual Defendants disregarded the known risks to Plaintiff's safety, doing nothing at all to save him.

10.    As a result of the February 26, 2015 incident, one inmate, the inmate who beat the Plaintiff, was charged with and indicted for aggravated assault, and awaits trial. No other inmate was charged. Nor was any member of the Jail staff reprimanded or otherwise disciplined as a result of the incident.

11.    Defendant Hamblen County and HCSD, with deliberate indifference, gross negligence, and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiff and all persons similarly situated, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies or practices of, among other things:

-4-

a.      Chronic overcrowding at the Jail;

b.      Chronic under-staffing at the Jail;

c.      Lack of an appropriate and safe classification system for segregating non-violent inmates from aggressive and violent inmates;

d.      Inadequate audio, video, and sight-lines;

e.      Failing to take adequate security measures to protect inmates from unnecessary harm, including but not limited to, the following: separation of inmates from potentially violent or dangerous inmates; use of security cameras to monitor violence within jail cells; training officers to monitor inmates and immediately respond to acts of violence, or threats of violence; recognizing potentially volatile situations and circumstances that are likely to erupt into violence;

f.      subjecting persons in their jails to violence perpetrated by other inmates;

g.      selecting, retaining and assigning employees to the Jail who exhibit deliberate indifference and reckless disregard for the safety, security and constitutional and statutory rights of inmates;

h.      failing to adequately train, supervise, and control officers in the arts of law enforcement;

i.      failing to adequately discipline officers involved in misconduct; and

f.      condoning and encouraging officers in the belief that they can violate the rights of persons such as Plaintiff with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

12.     These policies, customs, or practices are so permanent and well-settled that they are accepted and unchallenged by Defendants. Together, they constitute a policy, custom, or practice of deliberate indifference to the safety of inmates, including Plaintiff. They also serve as affirmative

links and motivating forces behind the deliberate indifference of Defendants, acting in concert to create the substantial risk of harm that resulted in severe injuries to Plaintiff at the hands of another inmate.

## II.  JURISDICTION AND VENUE

13.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under the Constitution of the United States and 42 U.S.C. § 1983.

14.    This Court has supplemental jurisdiction over any claims brought under Tennessee law pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

15.    Venue lies in the United States District Court for the Eastern District of Tennessee, Northeastern Division, at Greeneville, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Hamblen County.  28 U.S.C. § 1391(b)(2).

## III.  PARTIES

### A.    Plaintiff

16.    Plaintiff, Jeremy R. Garcia, is a citizen of the United States and a resident of Knox County, Tennessee.

### B.    Government Defendant

17.    Hamblen County, Tennessee ("Hamblen County") is a governmental entity and political subdivision of the State of Tennessee, duly organized.  It may be served through its chief executive officer, County Mayor Bill Brittain, at Hamblen County Courthouse, 511 West Second North Street, Morristown, TN 37814.

-6-

18.     Hamblen County was responsible for the creation of the HCSD, which, among other things must:

- train and certify its law enforcement employees;

- implement procedures and protocol to adhere to the Due Process Rights of citizens with whom its enforcement and jail employees interact; and

- build, maintain, and fund a safe and adequate jail.

19.     The Jail was constructed and commenced operations in or about 1979 and was renovated in 1988, 2003, and 2008.  The facility houses both male and female inmates, pre-detention and post-sentencing inmates, and has a maximum occupancy of 187 male inmates and 68 female inmates (255 total) with an annual operating budget of nearly Three Million Dollars ($3,000,000).

20.     The Annex, where most of the relevant events occurred, has a  capacity to hold no more than twenty-four (24) inmates.  During Plaintiff's incarceration, as many as eighty-nine (89) inmates – over three times capacity – were housed in the Annex.

21.     At all times, Hamblen County and the HCSD possessed the power  and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control,  employment,  assignment and removal of individual members of the HCSD, including those individuals charged with protecting the health and safety of inmates at the Jail, and to assure that said actions, policies, rules, regulations, practices and procedures of the HCSD and its employees and agents comply with the laws and constitutions of the United States and of the State of Tennessee.

22.     Hamblen County and the HCSD are answerable for the safekeeping of inmates in their custody and are also responsible for the management and control of the Jail facilities and for

-7-

all matters relating to the selection, supervision, promotion, training, and discipline of uniformed staff, including supervisory security staff, of the Jail. Hamblen County owns the Jail facility at 510 Allison Street, Morristown, Tennessee 37814-4057.

23.     The Jail and the Annex are operated by the HCSD. The Sheriff has a statutory duty to take charge and custody of the Jail and inmates housed therein, Tenn. Code Ann. § 41-4-101, and may appoint jailers, for whose actions he is civilly liable. Tenn. Code Ann. § 41-4-101.

### C.     Individual Defendants

24.     In this case, Hamblen County and the HCSD acted through their agents, employees, and servants, including policymakers and through Defendant Sheriff Esco R. Jarnagin ("Sheriff Jarnagin"), sued herein in his individual capacity and as principal on his official bond. Sheriff Jarnagin was operating under color of law. Sheriff Jarnagin is, upon information and belief, a citizen and resident of Hamblen County and may be served at 510 Allison St Morristown, Tennessee 37814-4057.

25.     At all times material hereto, Sheriff Jarnagin was the duly elected Sheriff of Hamblen County, statutorily responsible for the operation of the Jail and Jail Annex; for the screening, hiring, firing, training and the supervision of the jailers, deputies, corrections officers, and other jail personnel; and responsible for the safety and welfare of those housed in the Jail Annex. Tenn. Code Ann. §41-4-101.

26.     At all times mentioned herein, Sheriff Jarnagin was an employee, agent, and/or servant of Hamblen County, acting within the course and scope of said employment, agency and/or service, and possessed the power and authority and was charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the operation of the Jail and concerning

-8-

the means by which the lives and safety of inmates were to be secured, what criteria were to be used for placing inmates together in custody, what methods of placement of an inmate in a cell were appropriate to safeguard the safety of inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were to be in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to those others, what actions were to be taken when an inmate is attacked or injured while incarcerated within the Jail, and what methods of surveillance were to be used within the Jail to insure immediate response to and prevention of incidents of violence occurring within the Jail.

27.     At all times relevant, Defendant, Teresa Laws ("Captain Laws"), was a Captain and Jail Administrator employed by the HCSD. Captain Laws is being sued in her individual capacity and as principal on her official bond. Captain Laws was operating under color of law. Captain Laws is designated to operate the jail on a day-to-day basis. Captain Laws is, upon information and belief, a citizen and resident of Hamblen County and may be served at 510 Allison Street, Morristown, Tennessee 37814-4057.

28.     At all relevant times, Defendant, Eric Rice ("Corrections Officer Rice"), was a Corrections Officer employed by the HCSD. Corrections Officer Rice is being sued in his individual capacity and as principal on his official bond. Corrections Officer Rice was operating under color of law. Rice is, upon information and belief, a citizen and resident of Hamblen County and may be served at 510 Allison Street, Morristown, Tennessee 37814-4057.

29.     At all relevant times, Defendant, Dustin Tharp ("Tharp"), was a Corrections Officer employed by the HCSD. Tharp is sued in his individual capacity and as principal on his official bond. Tharp was operating under color of law. Tharp is, upon information and belief, a citizen and

resident of Hamblen County and may be served at 510 Allison Street, Morristown, Tennessee 37814-4057.

30.     Plaintiff sues the fictitious Does 1-10 Defendants because their true names and/or capacities and/or other facts showing their culpability are presently unknown. These Does are sued in their individual and official capacities as HCSD supervisors, administrators, deputies, or corrections officers, and as principals on their official bonds.[2]

31.     Does 1-10 are unknown officers of the HCSD, a sub-division of Hamblen County, who failed to take reasonable steps to protect Plaintiff during his incarceration on February 26, 2015 against the unlawful conduct alleged herein. They are also unknown participants who bear responsibility for the unsafe condition of the Jail. They are also sued in their individual and official capacities. Plaintiff is informed and believes, and thereupon alleges that at all times relevant herein, certain of the Doe Defendants were supervisors and policy makers for Hamblen County.

32.     Various persons or entities not made Defendants in this lawsuit, including but not limited to Hamblen County officials, commissioners, or HCSD employees, have participated as co-conspirators with Defendants in the violations asserted in this Complaint and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as Defendants at a later date. There is a finite number of co-conspirators and Plaintiff believes that their identities may be ascertained through Defendants' own records.

---

[2]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiff will seek leave of this Court to amend his Complaint to set forth the true names and capacities of such Defendants when their identities are ascertained. Plaintiff further alleges that each of the said Defendants are responsible in some manner for the occurrences herein alleged.

-10-

## IV. FACTUAL ALLEGATIONS

### A.    Events Leading Up to Plaintiff's February 26, 2015 Beating

33.    On August 13, 2014, misdemeanor theft charges were filed against Plaintiff, Jeremy R. Garcia, in Hamblen County, Tennessee, alleging a theft that occurred on August 8, 2014.  On September 2, 2014, Plaintiff was arrested and incarcerated in the Jail.[3]

### *"The House"*

34.    During this period of incarceration, Plaintiff became acquainted with Inmates Jessie Killion ("Inmate Killion") and Adam Dean  (a/k/a "Mean Dean" or "Dean Hill") ("Inmate Dean"), and later, Inmates Logan Lynch ("Inmate Lynch") and Joey Popaduik ("Inmate Popaduik"), four inmates who are part of a ring of inmates known as "The House" by some inmates.[4]

35.    Inmates Killion, Dean, Lynch, and Popaduik "run" an enterprise inside the Jail known by many inmates as "The Store."  Through The Store, members of The House sell food, tobacco, and other items to other inmates for a profit.  Corrections Officers who work at the Jail are well familiar with both The House and The Store.

---

[3]Plaintiff's criminal history shows that he has four convictions for misdemeanor theft, a conviction for driving without a license, and a misdemeanor drug possession charge.

[4]Inmates Killion, Lynch, and Popaduik were charged with conspiracy and aggravated assault in Hamblen County after Inmate Killion allegedly arranged the assistance of Inmates Lynch and Popaduik to beat another Jail inmate, Sterling Morgan, after Morgan was jailed for stabbing the boyfriend of Inmate Killion's mother, Lynn Killion.  Lynn Killion allegedly called the jail to tell her son that Morgan "needed to have his ass beat," after which her son, responded that he would "take care of it."  Popaduik later pleaded guilty to assault.  The charges against Inmates Killion and Lynch were dismissed with costs.

### *Plaintiff's alleged "debt" to The House*

36.     After being booked into the Jail on September 2, 2014, Plaintiff had to be transported from the Jail to appear for a scheduled court hearing on the charges.  When Plaintiff returned to the Jail, however, he discovered that fellow Inmates Killion and Dean had stolen his food.  Plaintiff also had no commissary credit on his Jail account.

37.     Due to the limited nature of meals served in the Jail, especially on weekends, Plaintiff was hungry.  Inmate Dean of The House told Plaintiff that if he signed a paper stating that whenever Plaintiff received funds on his commissary account, such funds would be "assigned" to Inmate Dean, Inmate Dean would give Plaintiff some "pop tarts" and tobacco.

38.     Plaintiff and Inmate Dean struck their "deal" in an area known as the Jail Annex. Upon information and belief, the capacity of the Annex is approximately twenty-four (24) inmates. During Plaintiff's period of incarceration, more than three times that number – approximately eighty-nine (89) inmates – were housed in the Annex.  For this reason, Plaintiff was not assigned a bed and was forced to sleep on the jail's concrete floor.

### *Threats and intimidation of Plaintiff by The House*

39.     It did not take long before Inmates Killion and Dean of The House began making physical threats toward Plaintiff for having not "paid up" on his alleged debt to The Store.

40.     Eventually, Corrections Officer Eric Rice ("Rice") transferred over $60 of Plaintiff's Jail commissary account to Inmate Dean.[5]  Nevertheless, Plaintiff still feared Inmates Killion and

---

[5]According to inmates, the Jail just instituted a commissary a few years ago.  Rice is the one who created it, and operates it. If an inmate has $400 on his credit card and wants commissary credit, only Rice can take care of it.  Inmates also believe that out of that credit, Rice "gets a cut."

Dean, due to the serious nature of and continued threats. Consequently, Plaintiff prepared a handwritten note, known in Jail parlance as a "kite," wherein he asked Corrections Officers to place him in solitary confinement or move him to an alternate location, for his protection.

41.    Unfortunately, Inmates Killion and Dean discovered Plaintiff's note to Corrections Officers by pulling down Plaintiff's pants and searching his belongings. Inmates Killion and Dean became very angry at Plaintiff, threatening him and challenging him to fight. Plaintiff was saved from being assaulted when Corrections Officers noticed the altercation and separated the men.

*Plaintiff's mother warns Sheriff Jarnagin*
*that Plaintiff was in danger*

42.    During this period of incarceration, Plaintiff called his mother, Ms. Bobbie Berry ("Ms. Berry" or Plaintiff's mother"), from the Jail and told her that he was scared that he was going to be beaten by Inmates Killion and Dean. Ms. Berry immediately telephoned Sheriff Jarnagin on no fewer than three occasions to complain about the overcrowded conditions at the Jail and to express her concern for her son's safety. Sheriff Jarnagin assured Ms. Berry that her son was safe while in custody at the Jail.

43.    Plaintiff's mother also telephoned Captain Teresa Laws ("Captain Laws"), the Jail Administrator, for help. Ms. Berry left messages for Captain Laws informing her of the perilous situation, but Captain Laws never returned Ms. Berry's telephone calls.

44.    Ultimately, Ms. Berry informed staff members at the Jail that she was considering contacting a local television news reporter to complain, express her concern for her son's well-being, and tell him about "what's going on in the Jail." Immediately thereafter, Corrections Officers at the jail began cutting off Plaintiff's telephone calls with his mother.

-13-

*The House continues to threaten and intimidate Plaintiff*

45.     Corrections Officers eventually acceded to Plaintiff's repeated requests, especially after witnessing Inmates Killion and Dean threaten Plaintiff, and re-located him to another area at the Jail.  This is when and where Plaintiff met Inmates Lynch and Popaduik of The House.

46.     Inmate Popaduik informed Plaintiff that Inmates Killion and Dean had taken Plaintiff's food while he was away at a court hearing.  This was purportedly done to force Plaintiff to "buy-in" to "the House Store."

47.     Although Plaintiff was re-housed in another area of the Jail, he did not escape intimidation by The House, as Inmates Popaduik and Lynch continued with the threats toward Plaintiff that had been initiated by Inmates Killion and Dean of The House.

*Plaintiff's release and second incarceration*

48.     Upon information and belief, Plaintiff was released from Jail custody on or about September 27, 2014, after pleading guilty to misdemeanor theft on September 10, 2014.

49.     At the time of his release, there was apparently a dispute about whether Plaintiff had "satisfied" his debt to The House before being released from custody.

50.     On February 24, 2015, at approximately 10:07 p.m., Plaintiff was booked on a violation of probation ("VOP") offense and returned to the Jail.

*Plaintiff pleaded with Rice for his safety*

51.     After Plaintiff was booked, Corrections Officer Rice, who, upon information and belief, had broken up the earlier altercation between Plaintiff and Inmates Killion and Dean during Plaintiff's September 2014 incarceration, informed Plaintiff that he was going to be housed in the Annex again, where Inmate Killion and other inmates affiliated with The House were likely housed.

-14-

Plaintiff pleaded with Rice not to house him at the Annex. This time, Rice ignored Plaintiff's pleas for safety, and casually responded, "Ah, Garcia, you got this, my money is on you." Rice then placed Plaintiff back in the Annex, where Inmate Killion, who had threatened, harassed, and intimidated Plaintiff earlier, was indeed housed.

52.     Rice remarked that a friend of Plaintiff's, Inmate Todd Moorie, a large physically imposing man, was also housed in the Annex and could "protect" him.

53.     Plaintiff was once again forced to sleep on the concrete floor of the jail, as no beds were available in the Annex. Also, Plaintiff had been seriously injured in a car wreck years ago, and endures chronic back pain. Consequently, he asked Jail staff for a "medical mat" on which to sleep on the concrete floor. His request was ignored and no such mat was provided to him.

### Plaintiff's concerns for his safety and efforts to be moved

54.     In addition to Plaintiff's mother's previous pleas to Sheriff Jarnagin and Captain Laws for her son's safety during his earlier confinement, she continued to seek help for her son during his second confinement at the Jail. Plaintiff himself repeatedly requested help from Corrections Officers, asking them to move him or to permit him to make a complaint about the threats, harassment, and intimidation directed at him by Inmate Killion and "The House." Plaintiff requested to be moved to the Workhouse on at least four (4) occasions. Plaintiff was also cautious when putting his fears in writing for fear "The House" would discover it (as they had previously done), leading to further harassment.

55.     The HCSD also has a kiosk at the Jail where inmates can make electronic complaints if they need to request a transfer due to trouble with other inmates or problems in general. Any complaints are directed to Captain Laws. However, inmates must be careful because the next inmate

-15-

using the Jail Kiosk may also view the previous complaint and see to whom it was directed, and

other inmates can look over the shoulder of inmates who are using the Jail Kiosk. Still, Plaintiff

made such complaints, and requested transfer to get away from Inmate Killion and other members

of The House. Like other Corrections Officers did, and would continue to do, Captain Laws appears

to have disregarded those pleas for help. Plaintiff was not moved and there is no evidence that his

safety was considered, notwithstanding the threats directed at him.

### Continuation of threats, harassment, and
### intimidation of Plaintiff by Inmate Killion

56. When Plaintiff was returned to the Annex by Corrections Officer Rice, he realized

that neither Inmate Dean[6] nor Inmate Lynch were there. Unfortunately, however, Inmates Killion

and Popaduik were there in the Annex, where they were allegedly running The Store.

57. On February 25, 2015, following Plaintiff's arraignment on his new misdemeanor

theft charge, Inmate Killion confronted Plaintiff and told him that he still had not forgotten about

Plaintiff's earlier "debt" to The Store. Inmate Killion demanded money from Plaintiff and threatened

him again.

58. Fearing that he was about to be assaulted, Plaintiff ultimately wrote a note that stated,

"I've got problems in this Annex, I need to get out ASAP. I am in fear of my life!" At

approximately noon on February 26, 2015, Plaintiff handed the note to Corrections Officer Dustin

Tharp, who told Plaintiff, "we'll do something."

---

[6]Dean had been released from custody in January 2015.

-16-

*Plaintiff continued to fear for his safety*

59.     By approximately 10:00 p.m. on the night of February 26, 2015, Plaintiff had not been moved to another area of the Jail, as Corrections Officer Tharp had promised, and Plaintiff became even more anxious and fearful of what Inmate Killion and The House might do to him. Although Inmate Moorie told Plaintiff to calm down and to not be nervous, Plaintiff tried his best to remain awake, but unfortunately, he was getting sleepy. Inmate Moorie told Plaintiff to get some rest on his assigned bed. Before heading to Moorie's bed, Plaintiff telephoned his mother to let her know that he was scared for his life.

60.     After taking temporary refuge in Inmate Moorie's bed, Plaintiff was awakened by another inmate who told Plaintiff to get out of Inmate Moorie's bed. Plaintiff complied. As Plaintiff left Inmate Moorie's bed and was walking around in the Annex, he noticed a man he had never seen before, Inmate Kaleb Enix, engaged in a heated argument with his girlfriend on the telephone.[7] Enix, a violent man, had just been jailed on domestic assault charges.

**B.     The "Hit" and Brutal Beating of Plaintiff by Inmate Enix**

*Inmate Killion plans the "hit" on Plaintiff*

61.     Another inmate, Joshua Everett Cole ("Inmate Cole"), was playing cards around this same time with Inmate Killion. According to Inmate Cole, Inmate Killion pointed out Plaintiff to everyone who was playing cards and said, "that's the mother fucker who owes me money."

62.     Shortly afterwards, Inmate Killion told Inmate Cole and others at the card table that he was going to "put out a hit" or "pay" someone to beat up Plaintiff. When Inmate Killion noticed the angry and agitated Inmate Enix arguing with his girlfriend on the telephone, Inmate Killion

---

[7]Enix was jailed on a charge of domestic assault.

believed he had found his man to carry out the "hit" on Plaintiff. Unbeknownst to Plaintiff, Inmate Killion gave Enix items from The Store as "payment" to beat Plaintiff while he slept.

### *Plaintiff is brutally beaten while asleep on the Jail floor*

63.     Plaintiff told Inmate Moorie that he was going to lie down on the Jail floor and try to get some rest because he could barely stay awake. The next thing Plaintiff remembers is waking up in a room in which Correction Officers were asking him if he was okay.

64.     While Plaintiff was asleep on the Jail floor, Inmate Enix, 20-years old and weighing over 200 pounds, had repeatedly punched the 40-year old, 160-pound Plaintiff in the head and face. Inmate Enix had landed more than a dozen direct blows to Plaintiff's head and face, that, according to a witness, sounded "like a hammer" thumping Plaintiff's face each time Enix made contact, as Plaintiff's face just kept bouncing off the jail's concrete floor.

### *Reaction of jail staff to Plaintiff's beating*

65.     At about 10:20 p.m. on February 26, 2015, Corrections Officer Tharp, who had received Plaintiff's note pleading for a transfer about ten hours earlier, was stationed in Annex Control when Inmate Cole banged on the window of Annex Control and shouted that another inmate was "checking out."[8]

66.     From his station in Annex Control, Corrections Officer Matthew Adkins saw Inmate Cole knocking on the window to get his attention. Another inmate, Travis Jennings, announced that there was a "man down" between bunks in the Annex. Corrections Officer Adkins radioed to other Corrections Officers. Corrections Officers Young, Simmons, and Sabetta and Patrolmen Edwards

---

[8]According to Corrections Officer Tharp's offense report, "checking out" means "needing to be moved from housing unit."

-18-

and Lane responded and came to the Annex. Sergeant Darrell Chase also responded. Corrections Officer Adkins entered the Annex and found Plaintiff bleeding profusely above a puddle of blood. Plaintiff was disoriented, incoherent, visibly upset, and scared, unable to identify who had assaulted him.

67.     Corrections Officers Adkins and Simmons removed Plaintiff from the Annex and escorted him to medical to be examined by Nurse Kathy Perkins, who attempted to clean Plaintiff's wounds. At Nurse Perkins' instructions, Plaintiff was moved into the old booking room by Corrections Officers Simmons and Young, given clean clothes, and cleaned up. Corrections Officers Adkins and Simmons "checked" Plaintiff's "mental state," concluding from his responses that he may have suffered a "head injury."

### C.     Plaintiff's Injuries Required Emergency Treatment, Transfer to a Trauma Hospital, and Immediate Surgery

68.     Plaintiff was transported to Hamblen County Hospital (Covenant Health) by Corrections Officer Sabetta, where medical personnel determined that Plaintiff needed to be transported to a trauma facility. Sergeant Chase contacted Captain Laws, who had also disregarded pleas for Plaintiff's transfer, and advised her of the situation, after which Captain Laws authorized Sergeant Chase to release Plaintiff from custody for emergency medical treatment.

69.     Plaintiff was stabilized and transported by ambulance to the University of Tennessee Medical Center in Knoxville, where tests (including x-rays, CT scans of head, neck, spine, face, and jaw) were performed and where Plaintiff underwent surgery to reduce and repair his multiple facial and nasal fractures, lacerations, including insertion of metal plates, screws, and sutures.

-19-

**D.  Circumstances Reveal Plaintiff's Safety Was Compromised.**

70.  The fact that Plaintiff was asleep when he was attacked and that he was so severely injured by the attack prevented him from realizing precisely what had happened to him, including who had attacked him.  Piecing together the statements of other inmates, Corrections Officers, security video, and other relevant information, the circumstances come more clearly into view.

71.  While there is a stationary security camera directly over the spot where Plaintiff had been sleeping (and where he was beaten), the only video received by Plaintiff's counsel is from a distant security camera ("camera number 2") at the opposite end of the Annex from the beating.  The line of sight for "Camera number 2" does not clearly show the location of the beating.  However, upon information and belief, a second camera was mounted directly above the floor where the beating occurred.  Although Plaintiff's counsel requested that video from the HCSD, it has not yet been produced.

72.  At the time of the beating, not a single Corrections Officer was present in the portion of the Annex where Plaintiff was housed.  In fact, Corrections Officers only come into that area of the Annex no more than once an hour.  This provided Inmate Killion with a prime opportunity to set the stage for the beating.  Corrections Officers did not arrive until Inmate Cole dragged Plaintiff's beaten and bloody body over to a large window to show them Plaintiff's bloody face and head, as Corrections Officers had not been properly paying attention to the jail's monitors.

73.  According to inmates, the on-duty Corrections Officers do not routinely monitor the inmates in the Annex.  During all times relevant herein, Corrections Officer Tharp was stationed in

the Annex Control room a few feet away from where the beating occurred, with video monitors viewing the inmates in Annex, and Corrections Officer Tharp appears to have been altogether indifferent to the attack until forced to act.

74. Notwithstanding the existence of multiple security cameras in the Annex, a large viewing window separating the Annex from the Annex Control room, and the occupied Annex control room just a few feet away, either Corrections Officers were not monitoring the actions of the inmates in the Annex or they were monitoring the inmates and deliberately permitted the attack on Plaintiff to occur.

75. According to witnesses, including Inmate Cole, Inmate Enix viciously punched Plaintiff no fewer than thirteen (13) or fourteen (14) times before Inmate Cole – not Corrections Officers – stepped in to stop the brutal assault. Either the Corrections Officers were not paying attention or they were simply indifferent to the attack. Every other inmate simply stood idly by and watched the beating.

76. Defendants Sheriff Jarnagin and Corrections Officers Rice and Tharp, and likely others, knew that Plaintiff had a previous volatile history with Inmate Killion and The House, and that those inmates had repeatedly threatened, intimidated, and harassed Plaintiff throughout his incarcerations. These Defendants also knew that Plaintiff and/or his mother had made direct and indirect pleas to the HCSD to move Plaintiff for his own safety and protection.

77. At the time that Plaintiff was brought into the Annex, there were other areas in the Jail where Plaintiff could have been housed.

78.     Defendants, including Corrections Officer Tharp, knew, or should have known, that Inmate Enix was agitated, angry, and demonstrated violent behavior in the minutes leading up to the beating.

79.     Additionally, while the Annex is intended to house only misdemeanor and or minimum security inmates, and while Plaintiff was a misdemeanor offender, Inmate Killion was jailed on felony charges and Inmate Enix was jailed on domestic assault charges.

**E.     Post-Incident Investigations and Repercussions**

80.     After the beating, Inmate Killion acknowledged that he and Inmate Dean operated "The Store" in the Annex and that Plaintiff had purportedly incurred a debt of $38.00 with the "Store" "a long time ago" that allegedly remained unpaid.  Inmate Killion was advised of the likelihood that he would "be charged," although he was not charged.  Defendants also failed to interview inmates who had eye-witnessed the attack.

81.     Telephone recordings obtained by Plaintiff's counsel of a conversation between Inmate Enix and his girlfriend reveal that after the beating occurred, Inmate Enix had telephoned his girlfriend a second time, during which conversation Inmate Enix made numerous cryptic references to the beating, undoubtedly implicating himself, and bragging about it.

82.     Notably, as Inmate Enix was describing the beating to his girlfriend, a second male voice – upon information and belief, Inmate Killion – says, "don't say nothing on that phone that you don't need to say," to which Inmate Enix replied, "I know, I got you."  Inmate Enix ends the call by describing the beating as "really cool."

83.     Inmate Cole witnessed the events leading up to the beating.  He stated that after seeing Inmate Enix visibly upset after his telephone call with his girlfriend, Inmate Killion told other

-22-

inmates with whom he was playing cards, including Inmate Cole, "that's my guy." Inmate Killion then told Inmate Enix that he would give him "two (2) boxes of pop tarts" and other commissary items if he would approach Plaintiff while he was asleep and "beat his ass." Inmate Enix replied, "Yea, I'll do that, I'm still pissed off about being arrested."

84.     At that point, Inmate Cole reportedly walked back over to his own bunk, under which Plaintiff was then sleeping on the floor a few feet away. Inmate Enix approached Plaintiff, pulled back Plaintiff's covers, and began punching him in the face. Although Plaintiff was awakened, Inmate Enix continued to punch him until Inmate Cole shoved him off of Plaintiff, and said, "stop, man, you're going to kill him."

85.     Inmate Cole reported that he dragged Plaintiff over to large window, on the opposite side of which is the Annex Control room where Corrections Officers are supposed to monitor inmates in the Annex. According to Inmate Cole, he then shouted "man down, man down!"

86.     Another inmate – Dana Wolfe – stated that he had witnessed "a red-headed guy with a goatee hit another guy." Inmate Bruce Mabe stated that Inmate Enix "got off the phone and went back there and started beating the guy while he was asleep. He just kept beating him till they pulled him off him. If they hadn't pulled him off he wouldn't have stopped." A third inmate – Inmate David Helton – said that he was asleep and woke up to see Plaintiff being walked out of the Annex, and that "Everybody was around a guy named 'Chunk,'" referring to Inmate Enix, who apparently said "they took pictures of my hand."[9] Inmate Enix himself gave a written statement and said that he "was mad," and "got up off the floor and hit a guy 3 or 4 times in the face."

_____

[9]Indeed, HCSD produced photos of Inmate Enix's hands, which showed abrasions on his knuckles.

-23-

87. On May 15, 2015, Inmate Enix was indicted by a Hamblen County Grand Jury on felony charges of aggravated assault (Case Number 15CR249). No other investigative reports or other records of Inmate Enix's involvement have been produced by HCSD. His trial date is currently set for March 9, 2016. No other charges were filed and no jail personnel have been reprimanded.

**F. Plaintiff's Injuries**

88. As a result of the beating on February 26, 2015, Plaintiff suffered the following injuries:

- multiple face fractures;

- closed fracture of the nasal bones;
  left orbital wall fracture;

- left maxillary sinus fracture;

- left zygomatic arch fracture;

- facial laceration below left eyebrow;

- contusion of scalp; and

- conjunctival hemorrhage.

89. The beating has also caused Plaintiff to suffer:

- Fainting spells;

- Frequent migraine headaches;

- Nightmares;

- Early phase and late phase insomnia;

- Exaggerated startle response;

- Memory loss;

- Moderate depression; and

-24-

- Severe anxiety and general nervousness.

90.     As a further result of the beating, Plaintiff has suffered immeasurable psychological harm and damage to his cognitive abilities, requiring continuous therapy, treatment, and psychiatric care, conscious physical pain, loss of enjoyment of life, humiliation, harm to his reputation, and emotional injury and distress.  Plaintiff's sleep is also constantly disrupted by severe pain in his jaw and head.  Plaintiff's appetite has diminished and he has suffered substantial weight loss since being beaten.  Plaintiff is also depressed and anxious, suffering frequent mood swings.

91.     Findings of testing administered by a neuropsychologist show that Plaintiff suffered a significant decline in his overall cognitive abilities as a result of the beating.

92.     Following Plaintiff's beating, he was diagnosed by a Licensed Clinical Psychologist and Neuropsychologist as suffering from:

- Post Traumatic Stress Disorder (DSM-IV code 309.81);

- Depressive Disorder Not Otherwise Specified (DSM-IV code 311);

- Cognitive Disorder Not Otherwise Specified (DSM-IV code 294.9);

- Borderline Intellectual Functioning (DSM-IV code V62.89);

- Dementia or severe memory impairment.

93.     In addition, as a result of the beating inflicted at the Jail, Plaintiff also suffers from severe impairments of the following:

- Executive function;

- Sustained attention;

- Semantic access;

- Sensory-motor speed;

-25-

- Immediate memory for verbal information;

- Delayed memory for verbal information;

- Delayed memory for visual material; and

- New learning.

94.     These injuries have subjected Plaintiff to the risk of possible nerve damage and increased risk of infection in the future.

### G.     Defendants Concealed Details of the Incident.

95.     The HCSD has concealed details concerning the Plaintiff's beating and HCSD's post-incident investigation.  On April 20, 2015, pursuant to Tenn. Code Ann. § 10-7-503, Plaintiff's attorney requested copies of any "relevant report," including tangible objects such as documents, photographs, tapes, jail records related to Plaintiff's incarceration.  The HCSD refused to provide copies of all pertinent videos, photographs, investigative files, statements and records, including information that resulted in charges against Inmate Enix and the apparent "exoneration" of Inmate Killion and other inmates who may have been involved in the conspiracy to assault Plaintiff.  HCSD has refused to turn over written reports or statements by HCSD medical personnel regarding Plaintiff's medical care while in HCSD custody.

96.     Until the withheld materials are furnished, it is impossible for Plaintiff's attorney to be reasonably certain that all of the facts surrounding the beating are known to him.

### H.     "You've Got a Serious Problem" – Safety Problems at the Hamblen County Jail

97.     The main Hamblen County Jail and Justice Center was constructed in 1979, and was most recently renovated in 2008.  The Jail has a certified capacity of 255; 187 beds for males and 68 beds for females.

-26-

98.     The Jail was decertified by the Tennessee Corrections Institute (TCI)[10] because of prisoner overcrowding in September 2010.  It has failed to meet Tennessee codes for certification purposes ever since, according to the County Mayor.  Both the County Mayor and Defendant Sheriff Jarnagin blame overcrowding for the Jail's problems.  Sheriff Jarnagin said,"we are not meeting minimum standards."  Indeed, the County Mayor said that he does not believe the current Jail will ever be re-certified due to its space issues.

99.     In the summer of 2015, Jim Hart ("Hart"), a corrections and jail consultant with Tennessee's County Technical Assistance Service, who has served a number of positions within corrections systems, including jail administrator and line officer, spoke to Hamblen County's Jail Study Committee members and told them that a Jail Assessment Report in 2010 had uncovered significant problems with the Jail facility and operations.  The 2012 report included a need for increased staffing and major challenges with crowding.  According to Hart, by 2015, "What was found in those two reports is still existing."

100.    Hart described Jail administrators as being in constant crisis management mode, putting out one fire after another, meaning they could never be proactive, as their jobs require, and pointed to major problems generated from a poor interior layout of the Jail.

101.    According to the minutes of a TCI Board of Control[11] meeting on September 2, 2015:

---

[10]Under the authority of T.C.A. § 41-4-140, the Tennessee Corrections Institute ("TCI") is required to establish minimum standards for adult local jails, lock-ups, workhouses and detention facilities in the state.

[11]The TCI's Board of Control establishes the standards to inspect and certify local correctional facilities.  Inspections and re-inspections are conducted within the mandated time-frame to ensure compliance of all standards for the purpose of certification.

■ "it has been years since Hamblen County Jail has had certification. There are multiple issues. Hamblen County has not made an effort to reach out to TCI to attain certification. . . . ;"

■ "During the inspection, there were many life safety issues;" and

■ "TCI cannot recommend certification because of too many life safety issues."[12]

102.    "All these reports are pointing fingers at the county, saying, 'You've got a serious problem,'" Hart said.   "It's a challenge to operate," Hart said. "You're one inmate away from being told what to do."[13]

103.    All of this "creates serious safety and security issues for inmates, correctional staff and community," TCI Detention Facility Specialist Tonya West stated in her report.

104.    Defendant Sheriff Jarnagin's excuse to all of this criticism of the Jail: "This is an old jail," he said. "It's got its problems but it's still functional as a jail."

### *The Hamblen County Jail is chronically and grossly overcrowded and Hamblen County has repeatedly been warned about the safety risks of overcrowding*

105.    Hamblen County's Annual Financial Report for 2013 acknowledged "numerous challenges" with its "aging jail facility," noting especially the "major overcrowding issue."

106.    Jail overcrowding is a custom that is tantamount to official policy.  Hamblen County Jail has a long history of overcrowded conditions.  Indeed, in March 2015, Chief Deputy Wayne

---

[12]*See* TCO Board of Control Minutes of September 2, 2015 Meeting, at p. 9.

[13]Hart noted that immediate issues for the Jail include Americans With Disabilities Act compliance.

Mize described the Jail's overcrowding problem "chronic." Chief Deputy Mize mused that a federal judge might find the conditions so bad that he "orders new construction on his own terms." "It's going to cost everyone if there's a lawsuit," Chief Deputy Mize said.

107. According to TDOC Jail Summary Reports, during the period of Plaintiff's incarceration, the Jail was operating at 143.9% capacity. In the months leading up to Plaintiff's brutal beating, the Jail housed approximately 300 inmates – almost 50 inmates over capacity. But Defendant Sheriff Jarnagin said that number is on "the lower end." At one point, the Jail had 120 prisoners over the limit. At the end of 2013, Defendant Sheriff Jarnagin observed, "We are certified to have 255 [inmates]." "Over the weekend, Saturday we had 362," Sheriff Jarnagin said. When that many inmates are incarcerated, "Those people are sleeping on the floor," said Sheriff Jarnagin. "When I say overcrowded, those people are sleeping on a concrete floor."

108. According to Hart, while the Jail is rated for 255 inmates, overcrowding actually occurs at prisoner number 230, because there should be a 10% amount of "wiggle room" for jailors.

109. According to Chief Deputy Mize, "Our population is running, on average, probably about fifty over every day." Chief Deputy Mize says that number sometimes climbs to 75 over the limit. The temporary solution, Chief Deputy Mize says, is to force some inmates to sleep on the floor. However, Chief Deputy Mize conceded that "Tempers flare. You have fights. The jailers have to deal with those situations every day." As in Plaintiff's case, "sleeping on the floor leaves inmates open to assaults," according to Chief Deputy Mize. Yet, inmates at the Jail are routinely not assigned beds, relegating them to sleep on the floor, subjected to assaults.

110. In June 2015, the Jail was re-inspected by the TCI. Numerous deficiencies were identified, including prisoner overcrowding. The inmate population on the day of the inspection was

302. The average daily inmate population for the period of January 1, 2015 – June 23, 2015 was 333. Due to overcrowding, insufficient square footage, toilet, sink, and shower ratios were noted throughout the jail facility in the re-inspection report.

### *Hamblen County Jail is inadequately staffed and Hamblen County has been repeatedly warned about the safety risks of under-staffing*

111. According to the State of Tennessee, the Jail is also dealing with under-staffing issues. According to Defendant Sheriff Jarnagin, these problems stem from the overcrowding problem. The excess amount of inmates have left the Jail staff having to do more work than normal. As one news report observed, "too many prisoners and too few guards. That's the problem Hamblen County officials have battled for years."

112. In an environment like the Jail's Annex, staff cannot protect against random and systematic violence. Under-staffing allows inmates to prey on others without detection. The statements of other Jail inmates bear out this contention. According to other Jail inmates, fights at the Jail are constant and routinely go unreported. Inmates who do not want to become enmeshed in fighting or disputes spend most of their time on their beds to avoid trouble, unless, like Plaintiff, they are not assigned to a bed and have to sleep on the floor, where, as Chief Deputy Mize said, they are particularly prone to be assaulted.

113. According to TCI Detention Facility Specialist West, the Hamblen County Jail "does not have sufficient staff to perform the functions relating to security, custody and supervision of inmates. The lack of security checks are a direct reflection of insufficient staffing to perform the necessary duties to maintain the safety and security throughout the facility."

-30-

114. An August 2013 report by the TCI indicated short-staffing posed real dangers to corrections officers. Too few corrections officers also result in too few security checks and inmate counts, according to the report. "The lack of security checks and inmate counts is a direct reflection of insufficient staffing to perform the necessary duties to maintain the safety and security throughout the facility," the report states. "This is only compounded by the supervisors having to work a post which takes away their ability to supervise the staff."

115. According to Chief Deputy Mize, on a typical day, ten (10) jailers will be scheduled to work inside the jail. Chief Mize says that while this might sound like an ample number to an outsider, even a cursory examination of their duties indicates otherwise, as he explained:

- Two jailers are designated transport officers, so when they're occupied taking prisoners to appointments or ferrying them to state prisons, the available workforce drops by 20 percent;

- Unlike modern facilities that have a single central control room that serves as a supervision point and a switch room for cell locks, the Hamblen County Jail has *four* control rooms. The four control-room deputies cannot abandon their posts without relief, which brings the available staff down to four, according to Mize;

- On a typical day, fifteen (15) inmates are booked into the jail and an approximately equal number are released, processes Mize says take about 30 minutes apiece, monopolizing the time of another jailer;

- If a corrections officers calls in sick, is on vacation or in training, that leaves two to feed inmates, attend to medical calls, arrange for inmates to meet with their attorneys and deal with bondsmen; and

- Should a fight breakout, a phenomenon Chief Mize says is "an every day occurrence," the math speaks for itself.

116. After all of this, "you're down to zero," Chief Mize said. "If a jailer in a control room sees something going on, he or she can't move. Ten sounds like a lot. When you get into operations, it's not a lot." Moreover, due to attrition, Chief Mize stated that "Half of our jail staff are essentially

-31-

rookies."[14]

117. Under the conditions that prevail at the Annex, even if Plaintiff had been awake, a Correction Officer would likely not have been able to come to his aid, as no Corrections Officer was present within the Annex where inmates were housed.

> ***Hamblen County Jail lacks an appropriate classification
> system of inmates and despite known safety risks, has
> failed to implement such a system.***

118. In addition to the admittedly chronic-overcrowding and gross under-staffing, the HCSD also has a practice or custom of failing to separate inmates by classification, and specifically, failing to segregate violent inmates or felony offenders from non-violent inmates or misdemeanor offenders.

119. According to Bob Bass, Detention Facility Specialist for the State of Tennessee, inmate supervision should be the primary function of the jail. This should include:

- Proper classification;

- Appropriate housing assignment;

- Meeting inmates' basic needs;

- Setting and conveying expectations for behavior;

- Continuous and active supervision of inmate behavior;

- Keeping inmates occupied with productive activities; and

- Holding inmates individually accountable for rule violations

---

[14]Sheriff Jarnagin has recently stated at a public meeting that he is so understaffed and underfunded that he can barely operate so it wouldn't surprise him if they just ended up remodeling the current jail and not put money into a new, more updated facility.

120.    Jail expert Hart says that "Categories of inmates should be separated by risk or by need." "You're approaching liability; if just one inmate makes a call to an attorney," Hart said. According to jail expert Bass, a proper inmate classification system would consider:

- Severity of current charges/convictions;

- Serious offense history;

- Escape history;

- Institutional disciplinary history;

- Prior felony convictions;

- Alcohol/drug abuse history; and

- Stability factors (*e.g.*, age, employment, length of residence)

121.    Hamblen County's Jail has no such system. It intermingles felons with misdemeanor offenders, violent offenders with non-violent offenders, and mentally-challenged offenders with intellectual disabilities with individuals with average intelligence.

***Hamblen County Jail lacks inadequate sight-lines
to monitor inmates and has failed to take measures
to correct this serious safety flaw.***

122.    In addition to the fact that the Jail is chronically overcrowded, grossly under-staffed, and lacks an appropriate classification system, the TCI's June 2015 re-inspection report also found that due to antiquated design and overcrowding, Jail inmate sight and sound separation is impossible to achieve in all areas of the Jail. Lack of actual sight-lines from the oversized Control room requires staff to move to various spots in the room in order to have a decent view of inmate housing and activity areas.

-33-

***Hamblen County has disregarded other Jail safety concerns***

123.     According to a June 23, 2015 re-inspection report completed by the TCI, issues at the

Jail include:

> ■ inmates were housed in the hall areas, shower areas and under bunks on the floor;

> ■ poor lighting and ventilation;

> ■ the workhouse control room was not secure during the inspection;

> ■ female inmates were allowed to intermingle unimpeded with male inmates (in the hall in front of the booking area);

> ■ female trustee workers were roaming the facility without the supervision of a correctional officer;

> ■ all cell areas in the original inmate housing areas had lighting that could only be controlled and turned on by the inmates in the cell areas;

> ■ Officers had to enter areas with very little lighting and have the inmates turn on their lights in the cells to be able to see;

> ■ inconsistent key control documentation;

> ■ lack of supervision for inmates using tools, supplies and equipment; and

> ■ weekly inspections of the facility were not being completed and the facility administrator or designee was not visiting the facility's living areas weekly.

124.     These problems also existed during Plaintiff's incarceration at the Jail.

-34-

## I.     Policies, Customs, or Practices Disregarding Inmate Safety Concerns

### *Hamblen County is Systematically Violating*
### *the Constitutional Rights of Inmates*

125.     Official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.

126.     Against this backdrop, Hamblen County systematically violates the constitutional rights of Jail inmates.  The beating suffered by Plaintiff on February 26, 2015 was in conjunction with a policy, custom, or usage of Hamblen County and/or the HCSD, to wit: it is a regularly recurring practice of the HCSD and its employees to employ and apply the same protocol, conventions, customs, or rules of conduct in operating the Jail.  This practice is  illustrated by an utter failure to consider the safety of Jail inmates.

127.     Plaintiff alleges that these constitutional violations were committed as a result of the policies and pervasive and long-standing customs and practices of the HCSD, and that Hamblen County is liable under the theory of respondeat superior for the torts committed by individual Defendants.

128.     Defendants, with deliberate indifference, gross negligence, and in reckless disregard to the safety and security and rights of Plaintiff (and all persons similarly situated), maintain, enforce, condone, tolerate, permit, acquiesce in, and apply policies, practices, or customs and usages of, among other things:

> ■ allowing the jail to become chronically over-crowded such that
> inmates are forced to sleep on the concrete floor, subjected to assault,
> and liable to encounter innumerable other safety risks, as described
> herein;

-35-

- under-staffing the jail with an appropriate number of and sufficiently trained custody personnel to permit security checks and proper monitoring of inmates;

- failing to separate inmates based upon risk, need, or other relevant classification; and

- failing to maintain appropriate inmate sight and sound separation to monitor inmates and keep them safe.

129.    The policies and procedures of the HCSD show deliberate indifference to these conditions and the serious risk these conditions pose to inmates' safety.

130.    For all of the reasons, Hamblen County and the HCSD have essentially abdicated their governmental responsibilities to provide a safe and secure incarceration environment to inmates.

131.    In Plaintiff's case, the policy and procedures of Hamblen County and the HCSD, as described herein, were substantial factors in causing his injuries.

132.    Defendants Sheriff Jarnagin, Captain Laws, and Corrections Officers Rice and Tharp were not charged or reprimanded for their acts or omissions which ultimately subjected Plaintiff to a brutal attack and beating while he was in their custody.  Hamblen County and the HCSD's willingness to allow those Defendants to escape reprimand or other repercussion despite their failure to protect Plaintiff under the circumstances described herein further represents deliberate indifference to Plaintiff's constitutionally-protected rights and an endorsement of the egregious safety failures that occurred in this case.

## V.   WAIVER OF IMMUNITY

133.    Hamblen County has waived immunity for harm caused as a result of a dangerous or defective condition of any building or public improvement to land.  Tenn. Code Ann. §29-20-204.

134.    Hamblen County has waived immunity for negligence of the county and county employees, misconduct of deputies acting under color of law, and for the negligence of deputies or employees of the HCSD or the county as set out in Tenn. Code Ann. §29-20-305 and by Tenn. Code Ann. §8-8-302-302 for intentional acts, omissions, or other misconduct done by deputies under color of law.

135.    There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VI.  CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF FEDERAL CIVIL RIGHTS LAWS UNDER COLOR OF LAW

### FOR MONETARY  RELIEF UNDER 42 U.S.C. §  1983

### (Against Individual Defendants)

136.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

137.    The Individual Defendants, while acting under color of law, deprived Plaintiff of his civil rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution when they acted with deliberate indifference and reckless disregard toward Plaintiff s safety, right to be afforded due process of law, and by, among other things, the following:

    (a)    Placing Plaintiff in the Annex with an inmate who Defendants knew, or should have known, had recently exhibited aggressive behavior, without watching, monitoring or protecting Plaintiff;

    (b)    Placing Plaintiff in the Annex under circumstances conducive to assault or the eruption of violence;

-37-

(c)     Not observing or protecting Plaintiff, or otherwise standing by and allowing Plaintiff to be brutally beaten by another inmate, resulting in unnecessary and severe injuries to Plaintiff.

138.    The Individual Defendants were aware of threats to Plaintiff's safety for days and/or hours prior to the brutal beating, based upon repeated verbal and written pleas for transfer by Plaintiff and by Plaintiff's mother. The Individual Defendants intentionally, recklessly, and with deliberate indifference, failed to take any security measures to protect Plaintiff from violent assault and battery.

139.    The above acts and omissions, while carried out under color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order. The above acts and omissions were consciously chosen from among various alternatives.

140.    As a direct and proximate result of the foregoing, Plaintiff suffered substantial physical and serious psychological injuries to his body and mind, pain and suffering, and medical expenses, as more specifically stated above.

141.    Plaintiff is entitled to an award of attorneys' fees, costs, and expenses under 42 U.S.C. §1988.

-38-

## COUNT TWO

## VIOLATION OF FEDERAL CIVIL RIGHTS LAWS UNDER COLOR OF LAW

## 42 U.S.C. §§, 1983, 1985, 1986 and 1988

### (Monell Claim)

### (Against Hamblen County)

142.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

143.     The Due Process Clause of the Fourteenth Amendment prohibits Hamblen County from having any custom, policy, practice, or procedure which would constitute the proximate cause of its officers' deprivation of any citizen's constitutional rights.

144.     Where such a custom, policy, or procedure has resulted in its officers' deprivations of a citizen's constitutional rights under 42 U.S.C. §1983, sovereign immunity is removed.

145.     This claim is to redress this deprivation, under color of authority, statute, ordinance, regulation, policy, custom, practice or usage of a right secured to Plaintiff by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

146.     The policies described herein, whereby the Jail is made unsafe and insecure to inmates who inhabit it, are, among other things, policies of reckless or deliberate indifference, comparable to deliberate action, such that the reasonably foreseeable consequence of these policies of mayhem logically include the deprivation of Plaintiff's and other inmates' constitutional rights, and the serious and disabling bodily and psychological injuries to Plaintiff. Defendant Hamblen County ratified or condoned these policies, exhibiting a marked failure to protect inmates in its custody.

147.    For instance, prior to February 26, 2015, Defendant Hamblen County and the HCSD implemented and maintained policies or customs exhibiting deliberate indifference and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff and other inmates, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/ or applied, among others, the following policies, practices and customs:

(a)    Failing to adequately train, supervise, and control custodians of jail inmates in the proper recognition of dangerous inmates and violent situations;

(b)    Failing to adequately train, supervise, and instruct custodians of jail inmates in properly monitoring, deterring, controlling and responding to inmate altercations and violence;

(c)    Failing to establish policies and procedures that enable identification and separation of extremely intoxicated, dangerous or violent inmates from other inmates;

(d)    Failing to adequately train, supervise and control custodians of jail inmates in the proper response to threats of violence;

(e)    Failing to maintain video surveillance of inmate areas to insure safety of inmates; and

(f)    Failing to establish policies and procedures to reduce the risk of inmate injury by providing for immediate response to inmate violence or threats of violence.

148.    All of these actions were done in violation of Plaintiff's civil rights under color of state law and constituted a systematic custom, policy, practice and procedure instituted for denial of the civil rights of inmates.

149.    Overcrowding, standing alone, is insufficient to establish a constitutional violation under the Fourth, Eighth, or the Fourteenth Amendment.  However, Plaintiff alleges that the chronically overcrowded conditions of the Jail combined with gross under-staffing of the Jail, a

-40-

plainly non-existent classification system at the Jail, a poorly-designed Jail Annex, the common recurring failure of Corrections Officers to monitor inmates in the Annex via video or otherwise unite to pose an unreasonable risk of harm.

150.    Hamblen County policymakers, including Defendant Sheriff Jarnagin, the County Mayor, and others were aware of, but chose to disregard, the unjustifiably high risk that these conditions at the Jail would likely cause inmates to be assaulted by other inmates.

151.    Chief Deputy Mize also conceded that a pattern of incidents of inmate-on-inmate assaults has occurred at the Jail area where Plaintiff was housed, and acknowledged that forcing inmates to sleep on the floor subjects them to assaults. Indeed, Plaintiff was forced to sleep on the floor and found himself the victim of a brutal assault.

152.    As a direct and proximate result of the foregoing, Plaintiff suffered substantial physical and serious psychological injury to his body and mind, pain and suffering, and medical expenses, as more specifically stated above.

153.    Plaintiff is entitled to an award of attorneys' fees, costs and expenses under 42 U.S.C. §1988.

## COUNT THREE

## VIOLATION OF FEDERAL CIVIL RIGHTS LAWS UNDER COLOR OF LAW

## FAILURE TO PROTECT INMATE IN CUSTODY

### (42 U.S.C.§§ 1983 and 1988)

### (Against Individual Defendants)

154.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

155.    The Jail also has a known problem of inmate-on-inmate violence.

-41-

156. Defendants owed a duty to protect Plaintiff from violence at the hands of other inmates. Therefore, a special relationship existed between Plaintiff and Defendants, which gave rise to their duty to protect Plaintiff. Defendants' breached that duty by the wrongful acts described herein and failed to take reasonable measures to protect Plaintiff from violence at the hands of other inmates. The aforementioned breach of duties by Defendants constitutes violations of Plaintiff's civil rights in contravention of 42 U.S.C. §1983.

157. At all times relevant, the Individual Defendants were charged with the constitutional duty to protect Plaintiff and to not knowingly, with wanton disregard, cause Plaintiff's life, health, and safety to be endangered by intentionally and/or deliberately ignoring any known dangers to Plaintiff.

158. Each of the Individual Defendants knew of the underlying facts indicating a sufficiently substantial danger to Plaintiff, the evidence demonstrates that each of the Individual Defendants was overwhelmed with ambivalence about Plaintiff's safety and well-being, and each of the Individual Defendants failed to respond reasonably to the Plaintiff's pleas for help.

159. Critically, after witnessing Inmates Killion and Dean threatening Plaintiff in the Annex during his initial incarceration, and after Plaintiff pleaded to be transferred, Corrections Officers transferred Plaintiff to another area of the jail. Plainly, Defendants had the ability to address dangers such as those about which Plaintiff warned.

160. Still, after Inmates Killion, Popaduik, and Lynch repeatedly directed threats toward Plaintiff, Defendants failed to transfer Plaintiff to an alternate housing location. Defendants knew of ways to address the danger to Plaintiff, but repeatedly declined to do so. Defendants' inaction caused Plaintiff's injuries because Defendants were in a position to take steps to avert the February

26, 2015 attack, but failed to do so. Defendants had access to, but altogether disregarded, means reasonably available to protect Plaintiff or avert the dangerous situation.

161.    Defendants violated the substantive due process rights of Plaintiff to be free from inmate-on-inmate violence while in custody because Defendants were deliberately indifferent to the risk of danger to Plaintiff by ignoring repeated pleas and requests for re-location due to prior and continuing threats and intimidation by Inmate Killion and others.

162.    Chief Deputy Mize publicly acknowledged that inmate-on-inmate assaults are common place at the Jail ("Tempers flare. You have fights. The jailers have to deal with those situations every day.") Thus, the risk of violent assaults between inmates was well known to Defendants.

163.    Each Defendant had ample and reasonably sufficient time and opportunity to intervene and prevent Plaintiff's injuries, and each was compelled to do so as an officer under the laws of the State of Tennessee and under the Constitution of the United States of America. In deliberate indifference to the life and welfare of Plaintiff, each Defendant intentionally refrained from intervening in the acts leading up to the brutal beating.

164.    As a result thereof, Plaintiff's rights under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated.

165.    As a direct and proximate result of the foregoing, Plaintiff suffered substantial physical and serious psychological injury to his body and mind, pain and suffering, and medical expenses, as more specifically stated above.

166.    Plaintiff is entitled to an award of attorneys' fees, costs and expenses under 42 U.S.C. §1988.

-43-

167.     The conduct of the Individual Defendants was intentional, malicious, willful, wanton and in reckless disregard of Plaintiff's constitutional rights and/or grossly negligent in that this conduct shocks the conscience and is fundamentally offensive to a civilized society, so as to justify the imposition of punitive damages on the Individual Defendants.

## COUNT FOUR

## VIOLATION OF FEDERAL CIVIL RIGHTS LAWS UNDER COLOR OF LAW

## FAILURE TO TRAIN AND SUPERVISE (42 U.S.C. § 1983)

### (Against Hamblen County)

168.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

169.     At all times mentioned herein and prior thereto, Defendant Hamblen County and the HCSD had a duty to train, instruct, supervise and discipline their subordinates to assure they respected and did not violate constitutional and statutory rights of inmates, and to objectively investigate violations of said prisoners' rights, including, but not limited to, the right to be safe and protected from injury while in Defendants' custody, under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

170.     Prior to the incident alleged herein, Defendants Hamblen County, Sheriff Jarnagin, and certain Doe Defendants facilitated, permitted, ratified, or condoned similar acts of inmate on inmate assaults, and were deliberately indifferent to the health and safety of inmates in general and Plaintiff in particular. Defendants knew, or should have reasonably known, of these practices, patterns or policies of constitutional violations, and additionally, of the existence of facts and situations which created the potential of unconstitutional acts, and had a duty to instruct, train, supervise and discipline their subordinates to prevent similar acts to others, but failed to do so.

-44-

171.    As a result thereof, Plaintiff's rights under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated.

172.    As a direct and proximate result of the foregoing, Plaintiff suffered substantial physical and serious psychological injury to his body and mind, pain and suffering, and medical expenses, as more specifically stated above.

173.    Plaintiff is entitled to an award of attorneys' fees, costs and expenses under 42 U.S.C. §1988.

174.    The conduct of the Individual Defendants mentioned herein, in their individual capacities, was intentional, malicious, willful, wanton and in reckless disregard of Plaintiff's constitutional rights and/or grossly negligent in that this conduct shocks the conscience and is fundamentally offensive to a civilized society, so as to justify the imposition of punitive damages on these Defendants in their individual capacity.

## COUNT FIVE

## AMERICANS WITH DISABILITIES ACT

### 42 U.S.C.§ 12101 et seq.

### (Against Hamblen County)

175.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

176.    Title II of the Americans with Disabilities Act of 1990,(ADA), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

-45-

177.    Plaintiff is an individual with a disability, *i.e.*, he suffers from chronic and disabling back problems associated with a car accident, and is otherwise qualified to participate in or receive the benefit of Hamblen County's services, programs, or activities.

178.    Defendants were aware of Plaintiff's disability, Plaintiff asked to be able to use a "medical mat" to sleep on the Jail floor, but Defendants intentionally refused to alter their conduct or modify their policies to accommodate for Plaintiff's disability, and failed to provide Plaintiff a medical pad and forcing him to sleep on a concrete floor.

179.    Plaintiff suffered physical and psychological injuries as a proximate result of Defendants' violation of the Americans With Disabilities Act.

## COUNT SIX

## TENNESSEE GOVERNMENTAL TORT LIABILITY ACT/NEGLIGENCE

### Tenn. Code Ann. § 29-20-101
### (Against All Defendants)

180.    Plaintiff hereby incorporates the preceding paragraphs of this complaint as if fully set forth herein.

181.    Hamblen County was responsible for the operation and the supervision of the Individual Defendants.

182.    Pursuant to the Tennessee Governmental Tort Liability Act, the Defendants owed Plaintiff a duty of care to provide him with a safe environment while he was detained in their custody.

183.    Defendants breached the duty of care as set forth herein and are therefore liable to Plaintiff.

-46-

184.     Plaintiff seeks money damages in the maximum amount allowed under Tennessee law.

## COUNT SEVEN

## OUTRAGEOUS CONDUCT/ INTENTIONAL

## INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

185.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this complaint.

186.     The allegations outlined herein against the individually named Defendants while Defendants were acting under color of law, were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

187.     The conduct of Defendants, as alleged above, was outrageous. Defendants, and each of them, knew that their conduct would result in bodily injuries and severe emotional distress to Plaintiff, and their conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish, and severe emotional distress upon Plaintiff.

188.     The aforementioned acts of Defendants were done knowingly, intentionally, and maliciously, for the purpose of harassment, oppression and inflicting injury upon Plaintiff, and in reckless, wanton and callous disregard of his safety, security, and civil rights. By reason thereof, Plaintiff claims punitive damages in an amount to be proven at trial.

189.     As a result of the conduct of Defendants, and each of them towards Plaintiff, Plaintiff has sustained and suffered, and continues to suffer, personal injuries as elsewhere alleged.

190.     Hamblen County is liable to Plaintiff under Tenn. Code Ann. § 8-8-301, et seq.

-47-

## VII.  DAMAGES

191.    Plaintiff hereby incorporates the preceding paragraphs of this complaint as if fully set forth herein.

192.    As a direct and proximate result of the deliberately indifferent and wrongful conduct of Defendants herein, Plaintiff has suffered, and continues to suffer, injury, damage, and loss including, but not limited to:

    (a)      Severe emotional distress;

    (b)      Impairment of earning capacity;

    (c)      Medical expenses, past and future;

    (d)      Pain and suffering;

    (e)      Brain injury; and

    (f)      Loss of enjoyment of life, resulting in Plaintiff's economic and non-economic damage in amounts to be proven at trial.

193.    The wrongful acts of the individually named Defendants were willful, oppressive, intentional and malicious; therefore, punitive damages should be assessed against Defendants in an amount deemed sufficient to punish and deter Defendants and others in similar positions of authority from engaging in similar conduct in the future.

194.    Pursuant to 42 U.S.C. § 1988(b), Plaintiff is entitled to recover his reasonable attorney fees incurred herein.

## VIII.  JURY DEMAND

195.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

-48-

# IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.     That the summons be issued and that Defendants be duly served with a copy of this Complaint and required to answer same;

B.     That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C.     That Plaintiff be awarded such damages as will fully compensate him for all injuries caused by Defendant's actions and that a judgment in favor of Plaintiff be entered;

D.     That Plaintiff be awarded compensatory damages in an amount to be determined by the trier of fact, not to exceed $3,000,000;

E.     That Plaintiff be awarded punitive damages in an amount to be determined by the trier of fact, not to exceed $2,000,000;

F.     That Plaintiff recover his costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law;

G.     That Plaintiff be awarded pre-judgment and post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 26th day of February, 2016.

/s/ Lance K. Baker
Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: 865-525-7028
Fax: 865-525-4679
lkbakerlaw@gmail.com

*Counsel for Plaintiff*

-49-